**PALAKIKO et al.**
**v.**
**HARPER, Warden of Oahu Prison.**
**No. 13394.**

United States Court of Appeals,
Ninth Circuit.

Dec. 10, 1953.

Bouslog & Symonds, Harriet Bouslog, Honolulu, Hawaii, for appellants.

Edward N. Sylva, Atty. Gen., Territory of Hawaii, Frank D. Gibson, Jr., Dep. Atty. Gen., Territory of Hawaii, for appellee.

Before STEPHENS, HEALY and POPE, Circuit Judges.

POPE, Circuit Judge.

We have here the same appellants who were before us at the time of our decision in Palakiko v. Territory of Hawaii, 9 Cir., 188 F.2d 54. That was upon an appeal from the judgment of the Supreme Court of the Territory of Hawaii affirming a judgment of conviction of the appellants of murder in the first degree. After the going down of mandate from this court, the hour for execution of death sentences was fixed at 8 o'clock on the morning of September 22, 1951. On the evening of September 21, 1951, the sister of appellant Palakiko, purporting to act on behalf of the appellants, presented to one of the Justices of the Territorial Supreme Court a petition for writ of habeas corpus. The Justice denied the petition but stayed execution and referred the petition to the full court. The court issued the writ and thereafter, upon the return and traverse thereof, held an extended hearing,[1] and thereupon entered its judgment denying relief and remanding the appellants to custody. This appeal is from that judgment.[2]

The petition alleged that the petitioners' conviction had been accomplished through a denial of due process of law within the meaning of the Fifth Amendment; that they had been com-

---

1. The hearing lasted thirty days. Sixty-five witnesses testified, their oral evidence requiring 2276 pages of transcript. In addition, the exhibits received included the complete transcript of the earlier criminal trial.

2. Title 28 U.S.C.A. § 1293: "Final decisions of Puerto Rico and Hawaii Supreme Courts—The courts of appeals for the First and Ninth Circuits shall have jurisdiction of appeals from all final decisions of the supreme courts of Puerto Rico and Hawaii, respectively in all cases involving the Constitution, laws or treaties of the United States or any authority exercised thereunder, in all habeas corpus proceedings, and in all other civil cases where the value in controversy exceeds $5,000, exclusive of interest and costs. * * *" Cf. Jimenez v. Jones, 1 Cir., 195 F.2d 159, 162: "Under 28 U.S.C. [A.] § 1293, this court has jurisdiction of appeals from all 'final decisions of the supreme court of Puerto Rico * * * in all habeas corpus proceedings * * *.' It is not necessary that appeals in such cases should present a federal question; though in so far as questions of local Puerto Rican law are concerned, this court in the exercise of its appellate jurisdiction may not reverse a judgment of the Supreme Court of Puerto Rico unless such judgment is deemed to be 'inescapably wrong' or 'patently erroneous'."

pelled to testify against themselves, and were deprived of other rights, privileges and immunities secured by the Constitution of the United States; and, in particular, that the confessions obtained from the petitioners, and which were described at length in our former opinion, were obtained by coercion and were wholly involuntary.

Because some of the issues raised here are the same as those discussed in the former appeal to this court, we shall assume a familiarity with our former decision, and not here review or restate what was there said respecting the circumstances of the crime.

### Whether the Writ May Reach Issues Previously Tried.

In the opinion of the Supreme Court of the Territory, Application of Palakiko and Majors, 39 Haw. 167, that court took note of the fact that the question whether the confessions were coerced had been dealt with at length upon the former appeals from the conviction. It referred to the frequently stated rule that a writ of habeas corpus cannot be substituted for an appeal even in a case in which no appeal was taken. It recognized that under exceptional circumstances habeas corpus may serve for an appeal, for instance, in cases where facts dehors the record were not open to consideration or review on appeal. The court concluded: "But no need for the remedy afforded by the writ of habeas corpus exists where a defendant was represented by counsel and has litigated issues of coerced confessions to final determination in exhaustion of appellate remedy and where the defendant, with different counsel, seeks to relitigate and have redetermined on habeas corpus the same issues. Nor has any territorial, state or federal court permitted habeas corpus to relitigate and redetermine issues already litigated to final appellate determination. To do so would cause litigation in criminal cases to be interminable and bring confusion into the administration of justice. A defendant may not litigate issues at trial and on direct attack exhaust his appellate remedies, as Palakiko and Majors did in this case, and then supersede those remedies on collateral attack, by habeas corpus, concerning the same issues which are admissive of the jurisdiction of the trial court to determine them." Accordingly the court held that "As to those confessions, the case of Palakiko and Majors is merely one of relitigation and redetermination of issues already litigated to final appellate determination."

In United States v. Rosenberg, 2 Cir., 200 F.2d 666, 668, certiorari denied 345 U.S. 965, 73 S.Ct. 949; Id., 345 U.S. 1003, 73 S.Ct. 1151, the court, speaking of the remedy under § 2255, Title 28, and comparing it to the writ of habeas corpus, said: "It, like that writ, 'cannot ordinarily be used in lieu of appeal to correct errors committed in the course of a trial, even *though such errors relate to constitutional rights.'* " (Emphasis added.)

The rule thus stated finds its support in numerous cases some of which are there cited. In some, as in Smith v. United States, 88 U.S.App.D.C. 80, 187 F.2d 192, certiorari denied 341 U.S. 927, 71 S.Ct. 792, 95 L.Ed. 1358, no appeal was taken.[3] It would appear that if the

3. In that case, in discussing the claim that a confession had been obtained by means violative of the due process clause of the Fifth Amendment, the court said, 187 F.2d at page 195: "In both the Watts and Malinski cases, however, the attack was direct, by appeal from the judgment of conviction. The proceedings now before us, on the other hand, arise upon a collateral attack under § 2255. Thus the question before us is not whether such a deprivation of constitutional rights requires reversal upon an appeal but whether it provides basis for a motion to vacate under § 2255. We recently indicated that the scope of review on such attack is the same as in habeas corpus cases. * * * When, as in Bowen v. Johnston, supra [306 U.S. 19, 59 S.Ct. 442, 83 L.Ed. 455], it is said that there has been a denial of 'constitutional rights,' * * * the whole course of events is to be considered, not merely the erroneous admission of evidence

fact that the accused has not taken the appeal which was available to him prevents a collateral attack upon a conviction by petition for writ of habeas corpus, or under § 2255, a similar result must obtain where, as here, the appeal was actually taken and the issue decided adversely to the appellant. Other cases in accord with those cited in the Rosenberg case, supra, are: Howell v. United States, 4 Cir., 172 F.2d 213, 215, certiorari denied 337 U.S. 906, 69 S.Ct. 1048, 93 L.Ed. 1718; Price v. Johnston, 9 Cir., 125 F.2d 806, certiorari denied 316 U.S. 677, 62 S.Ct. 1106, 86 L.Ed.

1750; Barber v. United States, 10 Cir., 197 F.2d 815, certiorari denied 344 U.S. 857, 73 S.Ct. 94; Cf. Goto v. Lane, 265 U.S. 393, 402, 44 S.Ct. 525, 527, 68 L.Ed. 1070.[4]

Counsel for appellants here assert that they should be permitted to relitigate the question of whether the confessions were procured by means amounting to a denial of due process for several reasons. In the first place it is said that there now has been presented evidence which was not introduced at the original trial and which is therefore matter dehors the record of the criminal convic-

---

claimed to infringe a right protected by the Constitution. Such admission alone does not result in the denial of a constitutional guaranty so long as the error is subject to correction on appeal and there is no indication of any deterrent to appeal, such as lack of counsel. Accordingly, in such circumstances the method of correction must be direct, not collateral. Otherwise a motion under § 2255 becomes indeed a substitute for the regular judicial process of trial and review."

4. "If the questions presented involved the application of constitutional principles, that alone did not alter the rule. * * * And, if the petitioners permitted the time within which a review on writ of error might be obtained to elapse and thereby lost the opportunity for such a review, that gave no right to resort to habeas corpus as a substitute."

A case which presented a similar question is Daniels v. Allen, 4 Cir., 192 F.2d 763, affirmed by the Supreme Court, sub nom. Brown v. Allen, 344 U.S. 443, 482, 73 S.Ct. 397. In that case the attack was upon a state court conviction and hence the claim with respect to the extorting of confessions was based upon the due process clause of the Fourteenth rather than of the Fifth Amendment. However, there the petitioners had been sentenced to death and hence the standards of due process in respect to their trial were no less than those required under the similar clause of the Fifth Amendment. Compare Bute v. People of State of Illinois, 333 U.S. 640, 68 S.Ct. 763, 92 L.Ed. 986, with Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L. Ed. 158. The Court of Appeals held that the issue of the alleged involuntary confessions and the other claimed denials of constitutional right in the trial could not be tried in habeas corpus proceed-

ings in the federal district court even although the appellants there had lost their right to have the questions reviewed by appeal to the State Supreme Court by failing to serve their statement on appeal within time. (They were one day too late.) In affirming that judgment the Supreme Court said through Mr. Justice Reed, 344 U.S. at pages 485–486, 73 S.Ct. at page 422: "Of course, federal habeas corpus is allowed where time has expired without appeal when the prisoner is detained without opportunity to appeal because of lack of counsel, incapacity, or some interference by officials. * * * Failure to appeal is much like a failure to raise a known and existing question of unconstitutional proceeding or action prior to conviction or commitment. Such failure, of course, bars subsequent objection to conviction on those grounds." And Mr. Justice Frankfurter speaking, not with particular reference to the Daniels case, but expressing views which were approved by all members of the court, said 344 U.S. at page 503, 73 S.Ct. at page 444: "Of course, nothing we have said suggests that the federal habeas corpus jurisdiction can displace a State's procedural rule requiring that certain errors be raised on appeal. Normally rights under the Federal Constitution may be waived at the trial, * * * and may likewise be waived by failure to assert such errors on appeal. * * * When a State insists that a defendant be held to his choice of trial strategy and not be allowed to try a different tack on State habeas corpus, he may be deemed to have waived his claim and thus have no right to assert on federal habeas corpus. Such considerations of orderly appellate procedure give rise to the conventional statement that habeas corpus should not do service for an appeal."

tion. For this reason it is said habeas corpus is a proper remedy.

It is true that there is now presented additional evidence upon the question of the voluntariness of the confessions which was not offered at the trial. The appellants did not testify at the trial, but at their hearing before the court below both testified at great length. Palakiko testified that he was beaten by two of the police officers and that his confession was given to avoid further beating. Majors testified that he was afraid of being beaten and that the first of his confessions was given during a long sustained questioning by police officers at a time when he was ill and not in possession of his faculties as a result of medication. Upon the habeas corpus proceeding appellants had a new attorney who assiduously procured subpoenas for the attendance of every available member of the Honolulu police force who was shown to have been at or about the police station at the time of the giving of the confessions. In addition the new attorney produced an expert witness to testify as to the effects of the dose of phenobarbital which Majors was given before he gave his first confession.

■ We cannot believe that the fact that additional evidence was adduced upon the hearing on this petition, albeit that this new evidence was not in the record of the original trial, is alone sufficient to permit a retrial of the original issue at this time. Were that the rule the prosecution of persons accused of crime would never come to an end. As stated in Bowen v. United States, 5 Cir., 192 F.2d 515, 517: "Especially is it of the essence of orderly trials that the right to counsel accorded to defendants by the constitution be not regarded, as the argument here would seem to regard it, as a mere one way street such that, if the strategy and tactics of his trial counsel, in determining not to raise constitutional questions, prove unsuccessful, defendant, without appealing from the judgment, may many years later set it aside in order that, on another trial with another counsel, another course

raising these questions may be taken, and so on ad infinitum."

### Representation of Counsel.

It is asserted that the rule above quoted from the Rosenberg case can have no application here because these appellants were denied effective representation of counsel and hence had no fair opportunity to present the question of the voluntariness of their confessions at the trial or upon the appeal from their conviction.

■ The Territorial Supreme Court found as a fact that such was not the case. It found that the appellants "had the assistance of counsel for their defense by three able and competent attorneys." The record sustains this finding. It is wholly lacking in any support for appellants' contention.

Counsel attempts to draw the inference that the appellants lost the opportunity to testify before the court, and in the absence of the jury, as to circumstances under which their confessions were obtained because their counsel did not know that they had the right thus to testify prior to the trial court's initial determination of the admissibility of the offered confessions. The transcript of the proceedings at the trial discloses that after a number of police officers had testified, (the jury being then absent), as to the circumstances under which the statements were given, the court inquired as to whether the defense desired to put on any evidence on the voluntariness of the confessions. The transcript then reads as follows: "Mr. Kobayashi: Well, at this time, Your Honor, before the defense put on any evidence I'd like to argue to the jury. The Court: Tomorrow morning at nine? Mr. Kobayashi: Yes. The Court: Well, that gives you an opportunity if you desire to present any evidence, counsel. Mr. Kobayashi: We haven't decided yet. Mr. Hawkins: May counsel be instructed, Your Honor, if he does he shall be ready to produce evidence at that time, 10 o'clock, the jury is being called for 10. The Court: The jury is called for

I'll ask counsel to be ready as soon as possible; counsel will be allowed to put on any evidence it desires. At this time the Court will adjourn until 9 o'clock tomorrow morning." It is argued that because the appellants' attorney said "Well, at this time your Honor, before the defense put on any evidence I'd like to argue to the jury", this demonstrates that counsel did not know they had the right to call the defendants to testify in the absence of the jury. We think that no such inference is permissible. Counsel knew that the next session would begin at 9 o'clock the following morning, and that the jury would not be called before 10 o'clock. He then stated that defendants had not decided yet what they would do at 9 o'clock the next morning. It is inconceivable that counsel referred to an argument to the jury at that time for he knew the jury would not then be present. We think that what we have here is a typographical error in the reporter's transcript and that what counsel probably said was: "I would like to argue in the absence of the jury". That such was his intention is further made plain by the fact that at the appointed time he proceeded to do just that, and did argue at length, to the court, and before the jury was called, the question of the admissibility of the offered confessions.

The record will not sustain a conclusion other than that the defendants chose for reasons of strategy not to take the stand either before the jury or upon the court's preliminary inquiry into the voluntariness of the confessions. Such a situation is not at all unusual. The hazards of being submitted to cross-examination following testimony of that character might well deter the most able counsel from putting defendant on the stand for any such limited purpose. Counsel would have had to try a great many criminal cases before he would be likely to participate in one in which the trial judge, on the basis of the testimony of the defendants, would exclude proffered confessions, the voluntariness of which had been supported by positive testimony for the prosecution. Once decision is made not to call the accused to testify before the jury, putting the accused on before the court alone might well be regarded by experienced counsel as a mere gesture of futility.

We find nothing whatever in the record to warrant a departure from the rule otherwise applicable, by reason of any lack of effective representation of counsel or by reason of any loss of an opportunity to testify as to the voluntariness of the confessions, resulting from counsel's incompetence or ignorance.

Nor can the fact that upon the trial before the Supreme Court of Hawaii appellants' new attorney produced more or better evidence in support of the claim of involuntariness, suffice to prove that appellants did not have effective representation of counsel. Defendants who are convicted after a trial in which they have not testified, can always, after conviction, file a petition for habeas corpus and then, having nothing to lose, take the stand. That would supply new evidence. As previously suggested, criminal prosecutions would never terminate if this circumstance enlarged the right to a writ of habeas corpus. We find nothing to disclose that lack of effective representation of counsel affected the validity of the proceedings here. The rule is as stated in United States v. Pisciotta, 2 Cir., 199 F.2d 603, 607: "Nor will allegations of incompetence or inefficiency on the part of his counsel ordinarily suffice, unless counsel's purported representation 'was such as to make the trial a farce and a mockery of justice'."

Finally, in support of the argument that this question may be tried upon habeas corpus, it is contended that the testimony elicited from some of the police officers upon this hearing discloses that the officers who testified at the trial as to the circumstances surrounding the taking of the confessions, swore falsely and therefore that this is a case in which it is demonstrated that the con-

viction was obtained by the knowing and deliberate use of false testimony.[5] We shall have occasion later to discuss at considerable length this testimony. It is sufficient at this point to say that the Territorial Supreme Court found no evidence of any such known use of perjured testimony and there is nothing to warrant us in holding that finding to be erroneous.

■■ The reason for the rule stated in the Rosenberg case, supra, is, we think, that while, as a matter of procedural due process, a person accused of crime must be given a fair opportunity to try the question whether he has been denied due process of law through the procurement of a coerced confession, yet he is not entitled to more, or to repeated trials of that question. Thus in Stein v. People of State of New York, 346 U.S. 156, 179, 73 S.Ct. 1077, 1090, where the question of the voluntariness of confessions was submitted to a jury, the court asked the question: "Was It Unconstitutional if These Confessions Were Used as the Basis of Conviction?" and in answering it said 346 U.S. at page 182, 73 S.Ct.

at page 1091: "When the issue has been fairly tried and reviewed, and there is no indication that constitutional standards of judgment have been disregarded, we will accord to the state's own decision great and, in the absence of impeachment by conceded facts, decisive respect." In a similar decision the Court of Appeals for the Third Circuit, (United States ex rel. Master v. Baldi, 198 F.2d 113, 118), quoted from Mr. Justice Reed's opinion in Lyons v. State of Oklahoma, 322 U.S. 596, 605, 64 S.Ct. 1208, 88 L.Ed. 1481, the following: "The Fourteenth Amendment does not provide review of mere error in jury verdicts, even though the error concerns the voluntary character of a confession."[6]

At the criminal trial, and upon the successive appeals from the conviction, appellants had their day in court on the question of the validity of their confessions. No shortage of testimony, no mistake of strategy there, could compare in egregiousness with the failure of Daniels and his counsel to perfect their appeal on time. Brown v. Allen, supra, 344 U.S. at page 484, 73 S.Ct. at page 421.[7]

---

5. Thus Officer Stevens who testified at the trial, stated that he was in a certain room alone with Palakiko for about three minutes. At the trial below two of the police officers stated that the time was five or ten minutes. Palakiko testified that while he was in this room with Stevens the latter beat him to obtain the confession.

6. Compare the following from the Stein case, supra, 346 U.S. at page 181, 73 S. Ct. at page 1091: "Mr. Justice Brandeis, for this Court, long ago warned that the Fourteenth Amendment does not, in guaranteeing due process, assure immunity from judicial error."

We have here a question of due process under the Fifth Amendment. But where the issues of fact as to whether due process has been denied have been tried in a Territorial Court, and those issues determined, the Fifth Amendment does not, any more than the Fourteenth, assure immunity from judicial error. More specifically and particularly, it does not authorize a second trial of the same issues under the guise of a petition for a writ of habeas corpus.

7. There is a question presented in the briefs filed on behalf of the Territory that this case may be disposed of on non-federal grounds, namely, that under the law of Hawaii the questions presented were not appropriate to be raised on a petition for habeas corpus and must rise on appeal from the original judgment of conviction. As we understand this portion of the brief, it compares the so-called "Hawaiian rule" to what Mr. Justice Frankfurter called in the above quotation "a State's procedural rule requiring that certain errors be raised on appeal". There is language in Jimenez v. Jones, supra, suggesting that the court there, dealing with a denial of a writ of habeas corpus by the Supreme Court of Puerto Rico, considered that "no substantial federal question is presented" [195 F.2d 162], for the reason that the Puerto Rico court "may have meant to deny the writ on the ground that the questions presented were not appropriate to be raised on a petition for habeas corpus but should have been raised on appeal from the original judgment of conviction." For reasons presently appearing we find

The court did not however, choose to base its decision solely upon its view that the questions relating to the confessions could not be raised by petition for habeas corpus. It proceeded to entertain and hear the petition both upon these and upon other questions; evidence was received on behalf of the petitioners and the respondent territorial officers. It then filed an extended opinion reciting its findings as to the allegations of the petition in respect to which testimony had thus been taken.

On account of the views which we entertain upon these matters, and the action of the court below in respect thereto, we prefer to base our decision respecting the confessions not merely upon our opinion as to the impropriety of the use of the petition for the writ, but also upon a consideration of the merits of the case sought to be made by the petitioners. Therefore we shall proceed to inquire whether the court's findings and conclusions with regard to them are erroneous and whether its judgment should for that reason be reversed. To that end we shall assume that this is a case presenting exceptional circumstances of such character as to permit presentation of such issues upon petition for writ of habeas corpus, Bowen v. Johnston, 306 U.S. 19, 27, 59 S.Ct. 442, 83 L.Ed. 455, taking it for granted that there was no legal impediment to the presentation to the court below of all questions raised by the petition for the writ and that the court properly proceeded to examine the facts and the law with respect thereto.

### The Palakiko Confession.

Palakiko testified that he made his confession only after he had been beaten by two police officers, members of the Honolulu City Police. The officer who questioned him and to whom the answers were given at the time the statement was made, the other officers who were present before, during, and after the questioning, and the shorthand reporter who took down the questions and answers, all denied that any force or threats of force were used, and testified that no promises of immunity or other inducements were held out to procure the statement.[8]

King, the first of the two officers whom Palakiko charged with beating him, was absent from the Territory and did not testify at the criminal trial or upon the hearing below on the petition for habeas corpus, but another officer, Schneider, testified that at the time of the alleged beating, King was not in the room alone with Palakiko for the reason that Schneider and King were together, and talked to Palakiko at the same time, questioning him about a certain bottle and some raincoats which were physical exhibits which served to connect Palakiko with the scene of the crime. Stevens, the other officer charged with striking Palakiko, was absent from the Territory and did not testify at the time of the hearing below, but he did testify at the criminal trial, and the entire record of that trial, including Stevens' testimony, was made a part of the record of this case. In that testimony Stevens said that he did not strike Palakiko or use any force or make any promises; that he did not take the statement from Palakiko; that he was in the room alone with Palakiko for approximately three minutes on the evening in question, and

---

no occasion to deal with this suggestion of counsel for the Territory.

8. Palakiko testified that he was beaten by two police officers, King and Stevens; that King first struck him several times while he and King were alone in a room; that King then left and afterwards Stevens entered the room where he and Stevens were alone and proceeded to strike him repeatedly on the cheek and "in his guts", and that during this beating he fell against the wall where his eyes or eyebrows were cut on the corner of a map which hung there; that he wiped the blood from his eyes on the white prison shirt he was wearing and while he was doing this Officer Stevens continued to beat him "in the guts"; that after twenty minutes of this, with interruptions by queries whether he still refused to talk, Palakiko finally said "all right, I will talk".

at that time the door of the room was ajar.

As we have previously indicated, there was substantially more testimony at the hearing below than there had been at the criminal trial relating to the circumstances under which Palakiko's statement was procured. Principally there was before the court Palakiko's own testimony to which we have referred. If that were believed it would of course show a denial of due process. In addition there was testimony which appellants say supports Palakiko's version of what happened. Thus Palakiko had testified that as a result of the beating his left eye was cut and bled profusely, and continued to bleed throughout the questioning, and that he continued to wipe off the blood with the white prison shirt he wore. There was some evidence that prior to the time when the questioning began, Palakiko was wearing a white shirt.[9]

A photograph taken by a newspaper photographer immediately following the taking of the statement from Palakiko was enlarged and the enlargement shows a mark over Palakiko's right eye and just below the eyebrow.[10]

Petitioners called and examined all of the police who were in or about the police station during the evening of March 20, 1948, when Palakiko was being questioned both at the police station and later at the scene of the crime where the questioning continued and where Palakiko pointed out the places where he said he and Majors entered the house and seized and bound Mrs. Wilder. When thus called and examined these officers did not always agree as to details.[11]

There were also introduced copies of the newspapers carrying the accounts obtained from the police department as to the manner in which the police had solved the Wilder case. These press releases, it was claimed, are inconsistent with the Territory's version of how the statements were procured.[12]

9. On the evening of March 20, 1948, the date of the taking of the statement, Palakiko was brought from Oahu prison to the police station. A former guard at the prison testified that Palakiko was then wearing a white prison shirt. Officer Straus who took the statement from Palakiko although saying "I am not too sure", thought he recalled that Palakiko was wearing a white shirt under a blue jacket. Palakiko testified that when taken from the prison he wore no blue jacket. Photographs taken of Palakiko immediately following the taking of his statement show that he was then wearing only a blue jacket. Palakiko could not account for what happened to the white shirt. The jacket shown was a prison jacket and shows a star, the insignia worn by prisoners in Palakiko's "Class A".

10. The photographer testified that he noticed the mark at the time the photograph was taken and described it as a mark of an old injury that was "healing". An examination of the exhibit discloses no other marks and none near the left eye where Palakiko testified the bleeding occurred. One of the police officers testified that he had noticed the mark at the time Palakiko first arrived at the police station that evening and he described the mark as a scar. None of the other police officers, guards, newspaper photographers or newspaper reporters observed any cuts, bruises or marks about Palakiko's face.

11. Thus although Stevens had testified that he was in the room alone with Palakiko for "approximately" three minutes, during which the door of the room was ajar, officers Schneider and Straus estimated this period as from five to ten minutes, and they and officer Mookini said that the door was closed.

12. A major portion of appellants' case is based upon certain statements in these newspapers: (a) The Honolulu Star-Bulletin for Monday, March 22, 1948, contained a lengthy account of the capture of Palakiko and Majors. (Majors had been captured on Sunday morning, March 21, following Palakiko's confession of Saturday night.) Detective Captain Kennedy testified below that he had furnished reporters the information from which they had written the newspaper accounts. Included in that account was the statement "Saturday night a relaxed and happy detective division grouped itself around the tables in the squad room and heard Captain Kennedy and his right hand man Captain M. Leon Straus di--

The Territorial Supreme Court after hearing all the evidence and observing Palakiko and his demeanor, found "his testimony on the issues of coerced confession to be false." It found there was no force, violence, duress, threats, misrepresentations or promises of immunity or reward made to obtain the confession, and that it was made "voluntarily, consonant to constitutional guarantees." [13]

There were many circumstances which the court undoubtedly had in mind when it arrived at its conclusions as to the facts. Thus Palakiko's mother and sister testified that they saw him at the police station on Monday, March 22, the second day following the alleged beating. They described his appearance by saying that "he was all swollen up in the face, and he had a plaster on his left eye." The sister described the swelling as being on both the right and left cheeks. The mother described his appearance by saying, "he was all beaten up". She said when she saw him she started to cry and got a handkerchief and cleaned the blood off his eyes.[14]

The former guard at Oahu prison who gave the testimony that Palakiko was wearing a white shirt, also testified that at 1:30 A. M. the next morning, Sunday, he saw two detectives at the police station, dressed in dungarees, bring Palakiko upstairs. As he put it "He was practically, I don't know, dragging him upstairs. He had no shirt on then and his head was hanging down". The Supreme Court was not required to credit any of this testimony. Other evidence pointed to the improbability that the guard was at either the prison or the

vulge to the press the details of the confession of Palakiko. * * * Working daily on the case were the following police officers and detectives." Here were listed the names of 21 officers including Kennedy and Straus. The thirteenth name was that of Detective Stevens. On the same page were photographs showing Majors and Palakiko and Kennedy's interview with the press. The picture with Palakiko bears the inscription "Two men who assisted materially in the capture of John Palakiko center. Left Detective Alyn Edmondston, right detective Vernal Stevens." It is argued that if Kennedy gave the press information on the basis of which these matters were written, the fact that Stevens was mentioned is consistent with Palakiko's claim that it was Stevens who actually procured the confession. (b) Kennedy, called and questioned on behalf of appellants with respect to the accounts carried in the issue of that date, both in the Bulletin and in the Advertiser, (the two daily newspapers), said that they appeared to be "the gist of what was released", and that the statements appeared to be the ones he made and to be true to the best of his knowledge. In the very lengthy Bulletin story is the statement concerning Palakiko that "He admitted his part to Detective Stevens and Captain Straus". It also said that he, Palakiko, "does not know yet that Mrs. Wilder is dead."

13. "On review of the entire record of hearing and trial, this court further finds that there was no force, violence, duress, threats, misrepresentations or promises of immunity or reward made to obtain the confessions of either Palakiko or Majors and a fortiori no concealment thereof at the trial. It also finds that the confessions were made voluntarily consonant to constitutional guarantees. Nor is there any indication that the testimony, on which the confessions were determined to be voluntary at the trial, is perjured and discovered to be such after trial so as not to have been open to consideration or reviewed on appeal. On the contrary, the hearing conclusively establishes such trial testimony to be credible, substantial and sufficient to warrant the admission of the confessions into evidence as the basis for conviction as determined on appellate review." 39 Haw. 167, 178.

14. The mother testified that she asked Palakiko "Who did this to you?" and that he said it was Straus. She said that the wound on his eye was big and wide and open "when I saw his cut"; that his face was "all black and blue"; that it was swollen "his eyes could hardly open; he could hardly stand on his feet". She described Palakiko as having this open wound on one eye and a plaster an inch and a half or two inches long and half an inch wide on the other eye. She lifted the plaster and saw that the cut beneath it was about as long as the plaster. The mother's sister and Palakiko's sister gave similar testimony.

police station at the time he claims to have seen Palakiko. The testimony of these members of Palakiko's family seems hardly credible. The Supreme Court, having Palakiko before it and observing the normal appearance of his face, could compare that appearance with the photograph taken on the evening of March 20, 1949, and know from that observation that on Saturday night after his confession, and on the following Monday morning, Palakiko's face showed no signs of having been beaten in the manner which he related, or had the appearance which these witnesses described.

As for the scar or mark that appears over Palakiko's right eye in the photograph, the court below was convinced that the glossy black and white enlargement emphasized the mark and brought it "into bolder relief". 39 Haw. 175. Those who were there and who testified that they noticed nothing unusual about Palakiko's face, and no marks or bruises whatever, included, besides twelve police officers and two prison guards, two newspaper photograhers, a newspaper reporter, and the acting prosecutor. During the period of his escape Palakiko had traveled for miles and at night through thick brush. Other portions of his body were covered with scratches from the brush, which, of course, could have caused the mark over the eye.

It is true that an examination of the testimony of the numerous police officers discloses certain discrepancies. That Stevens testified at the trial the period when he was alone with Palakiko was approximately three minutes, while Straus and Schneider testified it was from five to ten minutes, does not establish that some witness must have been testifying falsely. Discrepancies of that character are commonplace in any trial. Discrepancies are more likely to appear in the record of the testimony of the candid witness than in that of an astute perjurer.

If newspaper reports were to be elevated to the standing of testimony, their statements such as the one that Palakiko "admitted his part to Detective Stevens and Captain Straus", would carry more weight. But their only credential is the answer of Officer Kennedy, that they appeared to be "the gist of what was released". When the attention of the witness was called to the specific items noted in note 12 supra, (and those in note 20 infra), he pointed out that all except the one about Palakiko not knowing Mrs. Wilder was dead did not reflect anything he said and were not true in fact. Nor did he read over the account as he gave his answer. The court below, which observed this manner of questioning Captain Kennedy, would know, better than may we, how his answers must be evaluated.[14a] And an examination of the newspaper accounts discloses that they are full of mistakes and inaccuracies, as such an account is apt to be.[15]

14a. The newspapers were offered for the stated purpose of showing "the atmosphere that existed in the community". After they had been received for this purpose, they were displayed to Kennedy, who had been called as petitioners' witness, and an effort was made to have him say that the newspaper accounts correctly stated what he had told the newspaper reporters. The fact that the court permitted counsel to proceed in this novel manner, inquiring into what the witness said to the newspapers, rather than what the witness knew about the facts here in issue, illustrates the liberality with which the court admitted evidence offered by petitioners. Straus testified that it was when he first talked to Palakiko alone on March 20 that he told of Mrs. Wilder's death. A statement by Kennedy that Palakiko did not know would tend to prove no more than that Kennedy had not been told otherwise by Straus.

15. Thus the Bulletin article has Palakiko being brought from Oahu prison to the police station at 2:30 P.M. March 20th. All the evidence, including that of Palakiko, was that this occurred about 5 o'clock. The writer even has the Oahu prison officials sending out search parties for Palakiko after the death of Mrs. Wilder was discovered. At that time, of course, he was already in custody. A noteworthy circumstance, and a natural one, is the considerable diversity in the de-

We find nothing in these accounts giving credit to Stevens, along with other detectives, for the solving of the case, which even suggests that at the time of the press interview Captain Kennedy was indicating to the reporters that Stevens had a major part in procuring the Palakiko confession. Given equal prominence in the photograph was Officer Edmondston whose only connection was that he witnessed Palakiko's signature.

Another respect in which the testimony of Palakiko and that of the officers was in direct conflict was as to when and how Palakiko first learned that Mrs. Wilder had died. Palakiko testified that prior to making his statement when Straus showed him a picture of Mrs. Wilder, he, Palakiko, said he had seen the woman, and asked Straus how she was, and that Straus said "She's doing fine, Palakiko, she is okay." He testified he did not know she was dead until the next morning when he was told by Public Prosecutor Descha. Straus denied this, and testified that he told Palakiko she was dead before asking the questions which went into the statement. Descha saw Palakiko the next morning, but had no recollection of being the person who told him of the death.

If Palakiko did not know the woman was dead when he was questioned, that would not be significant.[16] He did not assert that he was ignorant of how he had left her. According to his own story, before he was taken to the scene of the crime, where the questioning was continued, he must have known something serious was afoot, for at that time a prison guard said to him: "Palakiko, you guys rape the wahine (woman)?"

Appellants here assume that it is our function to examine the record and from that record make our own independent findings as to the facts with respect to this confession. In this connection they refer to what they call the "uncontroverted testimony of Palakiko and Majors". But the legislative grant of an appeal to this court does not confer upon it the power or function of trying such cases de novo. It is of the essence of appellate review that the court to which the appeal is taken give due respect to the primary function of the trial court in finding and determining the facts. This ancient principle has been made express in Rule 52(a), Fed. Rules Civ.Proc., 28 U.S.C.A., governing our review of findings of fact made in the district courts. Although that rule as such does not extend to this review of the findings of fact of the Supreme Court of Hawaii, this principle of appellate review is just as applicable.

We cannot say that the Territorial Supreme Court findings with respect to the voluntary character of Palakiko's confession are clearly erroneous. Our study of the entire evidence leaves us with no definite or firm or any conviction that a mistake has been made. All of the considerations which lie at the foundation of this principle of review have application here where the Supreme Court sat for many days listening to the oral testimony and observing the demeanor of the witnesses and their manner of giving testimony.[17]

tails noted in the two papers, notwithstanding both got their information at the same press conference. (See note 20 infra.)

16. It has never yet been held that an officer who questions a suspect must first tell him all that the officer knows.

17. In Yutterman v. Sternberg, 8 Cir., 86 F.2d 321, 324, 111 A.L.R. 736, the court recites from the opinion of Judge Lamm of the Missouri Supreme Court, the often quoted statement of the advantages which the trial court has of resolving issues of fact and questions of credibility. Speaking of the trial judge he said: "He sees and hears much we cannot see and hear. We well know there are things of pith that cannot be preserved in or shown by the written page of a bill of exceptions. Truth does not always stalk boldly forth naked, but modest withal, in a printed abstract in a court of last resort. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere

This case has no resemblance in this respect to such cases as United States ex rel. Master v. Baldi, 3 Cir., 198 F.2d 113, and Hunter v. Dowd, 7 Cir., 198 F.2d 13. In the first of these cases the district court denied a petition for a writ of habeas corpus without a hearing. The respondent's answer did not deny the allegations of the petition. Hence, the appellate court held that "the factual averments of the petition, thus undenied, must be taken to be true." 198 F.2d at page 116. In the Hunter case, the facts upon which the decision of the appellate court was based, consisted of written documents and docket entries. From an analysis of those writings the appellate court was able to deduce the fact that the accused had not been represented by counsel at his criminal trial. Here the facts have been found after a long, careful and patient hearing by the members of a court to whose determinations as to the law of the Territory we are accustomed to give great deference and in respect to which we are permitted to disagree only in cases of manifest error. Waialua Agricultural Co. v. Christian, 305 U.S. 91, 109, 59 S.Ct. 21, 83 L.Ed. 60. We decline to assume here any greater power to overturn the findings of that court than we would exercise in respect to the findings of a district court under the rule of United States v. Oregon State Med. Soc., 343 U.S. 326, 339, 72 S.Ct. 690, 96 L.Ed. 978.

### The Majors Confessions.

This brings us to the question of Majors' confessions. It will be recalled (see our former opinion, Palakiko v. Territory of Hawaii, supra), that Majors and Palakiko, two inmates of Oahu prison, escaped on March 10, 1948. On March 16, 1948, the dead body of a Mrs. Wilder was discovered in her home near the road leading to the Pali. She had been bound hand and foot, and strapped on her bed in a position suggesting rape had been committed or attempted. The body's state of decomposition indicated death had occurred three or four days before. Prior to this discovery, and on March 12, Palakiko and Majors were found stealing a car; Palakiko was captured but Majors got away. When the crime was discovered articles picked up where Palakiko was caught pointed to his guilt and that of Majors. The latter was caught about 12:40 A. M., Sunday, March 21, and then drank the iodine as described in the former opinion. After his stomach was pumped out and while he was hospitalized, he gave his first two statements, on two different days. The times and circumstances of these were stated in our former opinion (188 F.2d at pages 55 and 56), and also the occasion for a third statement,—the one Majors signed,—made after he left the hospital and on March 24 (188 F.2d at pages 57 and 58). As there disclosed, in his second statement in the hospital Majors had admitted an actual sexual intercourse with the woman. In the third and final statement he denied this. When asked to explain the discrepancy he did so by referring to certain things he said Officer Stevens had said to him when the second statement was given.

When Majors testified at the hearing below, his story was in general outline the same as that given in that third statement, except that now he was more explicit in blaming what Officer Stevens had said, and the manner in which the questioning had been done, for his confessions. He did not testify that any

---

or the flippant or sneering tone, the heat, the calmness, the yawn, the sigh, the candor or lack of it, the scant or full realization of the solemnity of an oath, the carriage and mien. The brazen face of the liar, the glibness of the schooled witness in reciting a lesson, or the itching overeagerness of the swift witness, as well as honest face of the truthful one, are alone seen by him. In short, one witness may give testimony that reads in print, here, as if falling from the lips of an angel of light, and yet not a soul who heard it, nisi, believed a word of it; and another witness may testify so that it reads brokenly and obscurely in print, and yet there was that about the witness that carried conviction of truth to every soul who heard him testify." Creamer v. Bivert, 214 Mo. 473, 113 S.W. 1118.

force was used or that any one struck him, but he said Officer Stevens told him that when the officers got Majors out of the hospital they would take him to a certain room and "we would get it out of you".

Majors further testified that when he was taken from the hospital to the police station on March 24, he asked for Capt. Straus and said he wished to make a statement to him. Following this he made the last of the three statements which were received in evidence. This statement of March 24 was the only one of the three which Majors signed. It was signed in the presence of Officer Edmondston who made no threats against him. He said he was not afraid of Edmondston when he signed it.

Majors' version of the circumstances under which these statements were taken from him is that he was very sick when Officer Stevens talked to him in the hospital and that although he was very tired and wanted to sleep, Stevens persistently plied him with questions and gave him no rest. He testified, "It seemed like he was there all the time. I don't remember if he went home or anything. Q. Was he there every time you woke up? A. To me it felt that way." He said: "I felt drowsy and dopey. Every time I would try to sleep he would shake my hand and ask me questions. Q. Did you ever tell Vernon Stevens that you didn't want to answer questions? A. I told him many times. I told him I was sick, my throat was hurting too much to talk. I tried to sleep again and he would shake my arm and he would keep on asking me more questions." He said that Stevens told him he might as well tell everything because he was going to die anyway.

As for the third statement, Majors said that when he sought to give that to Officer Straus he didn't know whether he had previously made a statement to Stevens although the latter told him that he had. He said that he gave that statement to Straus in part because of the previous threats he had received from Stevens.

With respect to all of this the court below found "that the testimony of Majors on the issues of coercive confessions is not credible". All this testimony of threats, persistent questioning and other circumstances purporting, to show the statements were not voluntary, was contradicted by the officers who were present and by the shorthand reporters who took the statements. The court below had before it the entire record of the criminal trial, a part of which was the testimony of a Dr. Rhead who was resident psychiatrist in Queens Hospital at the time Majors was taken there. He was in charge of the Psychiatric Ward in which Majors was placed. We referred to the testimony of the doctor in our former opinion.[18] He said that he had given Majors both a physical and a psychiatric examination and that in his opinion Majors was competent and able to give a statement at the times he was questioned both on the morning of March 21 and on the afternoon of March 22. He expressed the view that the phenobarbital sedative given to Majors would make the patient sleepy for about fifteen hours but that during that period the patient would awaken occasionally and be rational.

At the trial below petitioners called a physician as an expert witness as to the effects of the drug phenobarbital when administered. This witness testified that an average dose would be from one and one-half to three grains. He described the four grains dose given to Majors as "fairly large", and said that such a dose would "be a depressant effect on the brain"; that it would induce sleep, and would depress a person's thinking ability slightly.[19]

18. The hospital doctor in whose care Majors was at the time of his first statement, that given at 10:45 A.M. on March 21, testified that although Majors would then be sleepy from the barbiturates, as well as in pain from the iodine, he was sufficiently in possession of his faculties to be able to think and to talk.

19. The court below was asked to take judicial notice of the following extracts

In respect to the first statement made by Majors, appellants rely strongly upon the newspaper accounts previously mentioned. (See note 12.)[20]

What we have said heretofore regarding the significance of the newspaper stories of Palakiko's confession could be repeated here. Some of the details recounted in note 20, supra, could not be true. The hospital record, hereafter mentioned, shows no such questioning "from 3 until about 6:30". Quite the contrary. No such story found its way into the Bulletin whose reporter attended the same press conference. The Bulletin correctly reported that Majors gave his first confession at 10:45 A.M. Majors himself says he was questioned by Stevens. He tells no story of anyone "working in relays".

The complete hospital record is in evidence and discloses the hour by hour notations of the nurses in attendance. It confirms the accounts given by the officers and does not support the claims of Majors.[21]

At a time which the hospital record discloses was 7 P. M. on the evening of March 21, Majors, in the presence of the police guard related to one of the doctors what happened when he and Palakiko made their escape. He told how they watched the house where they noticed a lone woman; how they entered the house looking for food; and how they gagged and tied the woman to her bed and then left the house. He related how Palakiko was captured and he had escaped, and while swimming a stream he had cut the hand which was being treated in the hospital.

There is no doubt that when Majors was captured and while he was confined in the hospital he was contemplating suicide. His throat was very sore; his stomach had been pumped out; he was not only under guard by the police but he was under observation in the psycho-

from a book on "Forensic Medicine" by Sydney Smith, 8th Ed., 1945, "Symptoms. In ordinary doses barbiturates produce a quiet, normal sleep without after effects. They all tend to cause depression of the respiratory and circulatory systems and a fall to a greater or less degree in blood pressure. These effects are more marked in intravenous medication. They produce a condition of confusion and amnesia. * * * They are excreted slowly, a single dose requiring about four days for complete excretion and therefore with repeated doses tend to accumulate in the blood."

20. The Advertiser for March 22 contained the statement that after he was taken to Queens Hospital, with "an apparent strong reluctance to answer the detectives' questions, Majors parried all attempts 'to break him down' from 3 until about 6:30 A.M. At that time doctors advised Detective Stevens to wait until Majors had rested before continuing the interrogation. Majors was then given a sedative and permitted to sleep until 9:30". The article referred to questions by detectives "working in relays".

21. The entries show that Majors was questioned by police when he first entered the hospital at 2:45 A.M. on March 21, 1948; at 4:30 he was given the four grains of phenobarbital and was then complaining of abdominal pain and the burning of his throat; he was unable to talk above a whisper; at 5 A.M. and 6 A. M. and 7 A.M. he was sleeping. He awoke at 7:30; at 8 he was fed; at 8:30 he took a bath then asked for cigarettes. During this time it is noted that a police officer was on guard and the 8:30 entry is "sullen; evades police officer's gaze. Will not look directly at any person." At 9 A.M. he was sleeping; from 10 A. M. until 12 noon he was being questioned by detectives and the entry notes: "eyes red; app. (apparently ?) has been crying, smoking cigarette". It was at this time that the first statement was given. The nurse's entry as of 7 to 7:15 that evening was "patient talked quietly to doctor and policeman telling his experiences; lying quietly after interview, smoking". The next morning, March 22, the patient was "sullen but quiet and cooperative, frequently asked for a cigarette, ate poorly; a cut on his hand was dressed occasionally." Between 1:40 and 3 that afternoon the detectives were in to see him. It was at this time that his second statement was given. The nurse's entry for this period is "smokes constantly—states that his throat feels better—still conversing with detectives". It was after this that his sister was in to see Majors and brought him cigarettes.

pathic ward where notations were made not only of his physical condition but of all manifestations of his mental attitudes. He smoked constantly; notation was made of his reading comic books; the officer on guard who testified as to his conversation with the doctor on the evening of March 21 said that two days later when Majors' sister visited him he was singing and playing a ukulele.

The main contention with respect to Majors is that the two statements taken in the hospital were obtained by what the Supreme Court, in Stein v. People of State of New York, supra, 346 U.S. at page 184, 73 S.Ct. at page 1092 calls "psychological coercion". As to this the question for the court below was whether the interrogation, which, as such, "is not inherently coercive," and which, without doubt the officer not only had the right, but owed the duty to undertake, was, under the circumstances, so conducted as to overpower the resistance of the person questioned. This was a question of fact.

Upon this record we must conclude, as we did with respect to the testimony of Palakiko, that the finding of the court below that as a matter of fact the statements made by Majors were given voluntarily is not clearly erroneous, and we find no reason for upsetting it.

Coercion "As a Matter of Law".

It is the contention of the appellants that wholly apart from the question whether the confessions were voluntary or involuntary as a matter of fact, the circumstances showed that they were involuntary as a matter of law. This appellants say is due to the fact that when the confessions were taken, Palakiko and Majors were being unlawfully detained in the custody of the police at the police station or at the hospital or at the Wilder residence rather than at Oahu Prison where they belonged. During this time they had no access to relatives or friends, or to counsel.

With respect to Palakiko it is said that the warden of Oahu Prison was not authorized to surrender Palakiko's custody (he was a federal prisoner), to the Honolulu police on the afternoon or evening of March 20, the day his confession was given. It is said also that his detention at the station from March 12 through March 17 was unlawful.[22]

With respect to Majors, it is said that it was the duty of the police to return him also to the warden. It is conceded that Majors as an escaped prisoner was subject to arrest upon sight, but it is argued that the means of arrest—the road block, and arrest on suspicion of being a hitch-hiker, was unlawful. We take it that it is the contention that the Honolulu police in detaining Majors in the hospital, in holding him at the police station, and taking his statement there and at the Wilder residence, were acting unlawfully, and that in consequence the taking of the confessions during that time was a denial of constitutional rights.[23]

This argument that the confessions were involuntary as a matter of

22. Appellants' assertion is stated thus: "It is not contended that Palakiko's arrest on March 12, 1948, was unlawful, but it is contended that his detention by police on suspicion and for investigation from March 12 through March 17, and again from March 20 through March 26, 1948, was unlawful. The duty of police under law was to return Palakiko to the custody of the warden of Oahu Prison, where he was a federal prisoner. The warden is not authorized by law to surrender custody of federal prisoners to the Honolulu police or to permit federal prisoners to remain indefinitely in the custody of the Honolulu police after their recapture."

23. Appellants say: "Entirely apart from any actual coercion or threats or promises rendering a confession involuntary as a matter of fact, the United States Supreme Court has held that where the circumstances surrounding the securing of a confession show a denial of fundamental constitutional rights, such a confession is involuntary as a matter of law, and a conviction based thereon is void. These cases were summarized by the court itself in McNabb v. United States, 318 U.S. 332 [63 S.Ct. 608, 87 L.Ed. 819] * * *."

law is wholly without substance. Neither the doctrine of the McNabb case, (McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819), upon which appellants seem to rely, nor Rule 5 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., upon which that doctrine is founded, has any application to prosecutions in Hawaiian courts. Even in a jurisdiction in which Rule 5 obtains, it and the doctrine of the McNabb case have no application to the police examination of a prisoner lawfully arrested and held under another charge. United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48. But even if it were granted that there was here some illegal detention, the Supreme Court has been at some pains to explain carefully that the rules stated in the McNabb and the Upshaw cases, (Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L. Ed. 100) "does not arise from constitutional sources." Brown v. Allen, supra, 344 U.S. at page 476, 73 S.Ct. at page 417.[24] See also Stein v. People of State of New York, supra, 346 U.S. at page 187, 73 S.Ct. at page 1094, and United States v. Walker, 2 Cir., 197 F.2d 287, 289. We are not willing to impose upon Hawaii an Island version of the McNabb rule, or any other mere rule of evidence. Of course the circumstances of a prisoner's detention, including illegal acts by those who hold him, are material when they have a bearing upon the manner in which he gave his confession or tend to show that a confession was involuntary. Stroble v. State of California, 343 U.S. 181, 197, 72 S.Ct. 599, 96 L.Ed. 872. But here the court below has found upon a record which warrants that conclusion that the detention of these appellants had nothing whatever to do with pro-

ducing the disclosures which they made. Under those circumstances even in a jurisdiction where the McNabb rule obtains, an illegal detention would not invalidate a confession. Allen v. United States, 91 U.S.App.D.C. 197, 202 F.2d 329, 334, certiorari denied 344 U.S. 869, 73 S.Ct. 112. The claims respecting the "illegal road block" and the manner in which petitioners were moved from prison to police station, not only have no bearing on the confessions,—they fail to establish any want of due process in any other respect. Cf. Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541.

### Concealment by Prosecution.

Another respect in which it is claimed that appellants were denied due process, is in the concealment at the time of the trial of certain material facts which were in the possession of the prosecution but which it is alleged were deliberately suppressed and concealed from the defendants. One such matter, concerning which extensive argument was made, had to do with the fact that prior to the criminal trial an article or articles of clothing taken from Mrs. Wilder or her bed had been submitted to the FBI for laboratory tests upon which the FBI made a report showing that the tests were negative. It is argued that the failure of the prosecution to make the result of these tests known to the defendants at their trial, was so fundamentally unfair as to affect the validity of the conviction.

 Counsel argue that it is a matter of judicial notice that there is no such thing as an "immaculate" rape since as a matter of scientific fact spermatozoa could be detected in seminal

---

24. The facts before the court there are indicated by its statement on the same page, "if the delay in the arraignment of petitioner was greater than that which might be tolerated in a federal criminal proceeding, due process was not violated."

In connection with the argument here referred to appellants vigorously attack §§ 10705 to 10709, Revised Laws of Hawaii, 1945, which permit arrest and detention

for examination of certain persons without a warrant. It is asserted that the statute is "notoriously unconstitutional". We do not understand that the Territory or the officers purported to rely upon any such statute, and the court below makes no allusion to it in the holding that the confessions were properly taken. We do not perceive that it has any bearing here.

stains after they had dried and for an indefinite period. We think there is no basis for the argument thus made. The FBI report referred to dealt with a chemical analysis of Mrs. Wilder's slip which was found on her body. At the criminal trial this slip, marked Exhibit 28, was produced and identified as having been removed from the body. The identifying witness then testified that the slits which were then in the slip "was done either by Sergeant Cunningham or the FBI laboratory". Counsel for the defendants then interrogated the witness who had assisted in removing the slip from the body and elicited the fact that it had been given to Sergeant Cunningham and that later he "sent it to the FBI laboratory for analysis". (The exhibit, upon objection by defendants, was not admitted in evidence.) It is thus clear that the fact that an analysis had been undertaken was disclosed by the prosecution at the trial. There is nothing to show that counsel for the defendants failed to understand that the analysis must have been negative or that they sought or were denied any opportunity to inspect the report.[25]

We have no doubt, and counsel for the defendants must have assumed, that the prosecution attempted to procure fingerprint evidence from the Wilder home. If none was obtainable due process would hardly require the prosecution to make a statement to that effect to the accused. The argument as to the FBI report is just as untenable.

 Again it was developed at the hearing below that prior to the criminal trial there was available to the prosecution the written report of a post mortem examination of the body of Mrs. Wilder to the coroner made by a Dr. Majoska, a public medical officer. This report contained the statement that "the vagina was examined in detail was found to contain only post mortem decomposition liquid. * * * Subsequent examination failed to reveal the presence of any gonococcoid organisms or spermatozoa." It is argued that the existence of this report was suppressed. We find no basis for this complaint, for the doctor was a witness at the criminal trial and gave precisely the same testimony adding that the negative findings were "as might be expected considering the advanced decomposition that had taken place within the body." [26]

---

**25.** Upon this petition for a writ of habeas corpus the appellants are not permitted to claim the issuance of the writ on the ground they were not guilty of the offense charged. Hastings v. United States, 9 Cir., 184 F.2d 939, 940. Indeed the question of guilt or innocence is not in issue. Some of the argument made before the court, however, strongly suggested an effort to convince the court that the record with respect to this negative FBI analysis must demonstrate that the appellants were not guilty of murder in the first degree. (There was no attempt to suggest that they were not guilty of second degree murder.) If the first degree conviction was dependent upon evidence of rape or attempted rape, it is suggested that the impossibility of the act having been committed should be a reason for special care and caution on our part in scrutinizing the other contentions made. The prosecution's answer to the contention as to the impossibility of an "immaculate" rape is to refer us to the third statement of Majors in which he

described how he got on the woman and tried to spread her legs and then masturbated, catching the semen in a paper.

**26.** Appellants' brief is full of assertions that the prosecution concealed, suppressed or misstated evidence. Many of the items listed are so insignificant or tenuous that it is difficult to take them seriously. Thus at the hearing it developed that Officer Harris had been handcuffed to Palakiko for about an hour and twenty minutes at the time Palakiko was first taken to the scene of the crime and where questioning of him was continued. Concealment is charged in that it was not developed at the criminal trial that Harris was present during this time. A detective Nobriga, it developed at the trial below, saw Palakiko at the police station on the evening of March 20 in company with Officers Stevens and Cockett. This was at an hour just prior to the taking of Palakiko's statement. It is argued that this demonstrates that what Detective Nobriga saw was concealed from the court at the time

### Prejudicial Influences Outside the Courtroom.

It is next urged that the conviction of the appellants was void because they were denied a fair trial and due process of law since the atmosphere of public clamor for their indictment and conviction, brought about by public feeling and newspaper reports of the offense, made a fair trial impossible.

The petitioners introduced in evidence a large number of copies of the two daily newspapers, the "Honolulu Advertiser" and the "Honolulu Star Bulletin", some of them carrying banner headlines relating to the finding of Mrs. Wilder's body, the search for the parties guilty of tying and leaving her to die in her bed, the capture of the two appellants, and the confessions which they were said to have made. Such matters were referred to by the newspapers at length during the first ten days following the discovery of Mrs. Wilder's body. After these first days there were other news items which related to moves made by the prosecution or the defense preliminary to the trial, such as defense motions, rulings thereon, postponement of hearings, and the like. Such matters did not involve extensive articles or display headlines. In addition, the newspapers carried some editorials referring to crime in general, to juvenile delinquency, and to laxity in permitting convicts to escape. It also appears that while they were awaiting trial, Majors and Palakiko had been sent to a mental clinic to undergo tests to determine their sanity. While they were there they escaped but were almost immediately caught. Their attempted escape was also reported somewhat at length in the news-

papers. But during the period of the trial the news stories were mere factual accounts of the day to day progress of the trial.

It was also shown that following the discovery of Mrs. Wilder's body, and before apprehension of the petitioners, the city and county supervisors offered a $500 reward for the "apprehension and conviction of the fiend or fiends who have committed this horrible crime". The Chamber of Commerce offered a reward of $1500 for information leading to the arrest of the guilty persons. It set up a law enforcement committee whose chairman was quoted in one of the newspapers as calling for "death for the murderer", all at a date prior to the making of Palakiko's confession or Majors' arrest. One editorial was entitled "A Community Aroused". The police broadcast requests for information of possible clues; and cars passing over the road near the Wilder home were stopped and the occupants questioned as to whether they had seen anything or anybody arousing suspicion during the preceding days.

Appellants assert that all of this publicity and hue and cry led to their having been charged with first degree murder rather than murder in the second degree (which was the charge first filed by the prosecutor), and that for the same reason, the trial of their case was advanced and placed ahead of numerous other criminal cases awaiting trial. (The trial was begun on June 7, 1948, 75 days after the date of Majors' final confession.) They say that this evidence of the atmosphere in the community shows that a fair trial was impossible; that it was an air of hysteria and clamor

---

of the trial. It also appears that Capt. Straus took a statement from Palakiko on Sunday, March 21. This statement, whatever it was, was never produced or used at the trial. It is complained that the failure to refer to it was a suppression of evidence which voids the conviction. Complaint is made that Capt. Straus failed to disclose at the criminal trial that he had made several unsuccessful attempts to get a confession from Palakiko

prior to the time that Palakiko finally made the statement which was in evidence, and that Palakiko had been kept at the police station between the date of his capture and March 17. There is not the slightest showing that the failure to mention these various matters at the criminal trial was either deliberate or anything other than the result of the belief of prosecutor or witnesses that they were not material.

for indictment and conviction on first degree charges, and their trial under these circumstances amounted to a denial of due process of law under the rule stated in Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543.

The attorney who handled the prosecution during its early stages and who had then expressed the view that the evidence would not warrant a charge of more than second degree murder, stated to the court below his opinion that the atmosphere in the community was such "that our jury here would be influenced so that it would not give a fair and impartial trial". He stated that if he had represented the defendants he would have asked for a change of venue. (This witness did not participate in the trial.)

Witnesses called by respondents, members of the Bar who were present in Honolulu at the times in question, expressed a contrary opinion. The Territorial Supreme Court upon this record held that there is no evidence that these reports, articles and editorials so aroused public feeling against the defendants that a change of venue became necessary or had the effect of intimidating or prejudicing any witness or juror at the trial. It said: "The trial patently was conducted in a calm and judicial atmosphere and in a circumspect and orderly manner. Nor was there any sign, threat or fear of mob violence or any suggestion of mob spirit within the community. Indeed no semblance of a mob existed from the time of murder to the end of trial, or at any time, and no other influence that in any way impaired the securing of a fair and impartial trial, or that in any way affected the prosecuting authorities, the grand and petit juries, and the defense attorneys in carrying out their duties, or prevented a full and proper presentation of any defense."

We are unable to discover anything in this extensive record of newspaper accounts, editorials, offers of reward and the like, which would require us to hold that the court's finding in this regard is clearly erroneous. The picture of newspaper publicity with respect to this matter is no different than that which would be expected under like conditions in any portion of the United States. An elderly woman, member of a prominent and well-known family, tied on her bed by some criminal marauder, is found dead some days later. That the newspapers should use banner headlines and make the most of the incidents surrounding the arrest and holding of the recaptured escaped convicts, is a phenomenon which is a part of the pattern of life anywhere in the United States. It is the sort of thing which gives concern to members of the bar generally,[27] and to the courts.[28]

But if we assume, as we are asked to do, that the prospective jurors read these newspapers, we must also assume that counsel for the appellants read them too. At no time was any motion made either for a change of venue or for a continuance.[29] When the criminal case was called for trial, counsel for the defense announced that they were ready and the trial proceeded.

We cannot say that counsel for the defense even made a mistake in not seeking a change of venue. If the place of trial had been changed, the change would have been to some other island in the territory. The two daily newspapers published in the metropolis may well have had general circulation throughout

27. See "Fair Trial and Free Press: A Subject Vital to the Existence of Democracy", by Edwin M. Otterbourg, 39 American Bar Association Journal, 978 (Nov. 1953).

28. Mr. Justice Jackson, in Shepherd v. State of Florida, 341 U.S. 50, 55, 71 S. Ct. 549, 551, 95 L.Ed. 740: "The case presents one of the best examples of one of the worst menaces to American justice."

29. The defendants interposed a demurrer to the indictment and other motions including motion for mental examination and a motion for a bill of particulars. The record before us shows no other motions.

the Hawaiian Islands.[30] Public sentiment elsewhere may well have been no different than in Honolulu. That a later collateral attack cannot thus be made upon a conviction because of adverse newspaper publicity with respect to which counsel in the criminal case made no move is pointed out in United States v. Rosenberg, supra, 200 F.2d at page 670: "When publicity believed to be prejudicial occurs during a trial, the defendant may move for a mistrial or may request the trial judge to caution the jury to disregard it. * * * But they did not so move. This was their deliberate choice after conferring with the judge out of the presence of the jury. * * * As they thus chose to have the trial continue, they obviously concluded that the prosecutor's statement to the press had not prejudiced the jury against them. Having themselves so concluded, they may not, after an adverse verdict, ask the court to reach a contrary conclusion."

The record here falls short of any showing that the case was tried in an atmosphere of hysteria and prejudice so great that the proceedings were a farce and the trial no trial at all. In Shepherd v. State of Florida, supra (note 28), the newspapers published as a fact that the defendants had confessed when no such thing had happened. The report was a fiction. There is no claim here that the newspaper accounts were false or distorted. The editorials were in the main directed not against the accused as individuals but against the laxity of the officers in permitting convicts to escape, and against social evils which contributed to the delinquency of young criminals. We cannot say that the situation here showed the extremes of newspaper publicity and headlines which were dealt with in Stroble v. California, supra. There six weeks elapsed between the date of defendant's arrest and the beginning of his trial. Here the period was nearly eleven weeks. There as here the banner headlines were at the time search went on for the perpetrator of the crime and during the few days immediately following the arrest and the confession. But it was there noted that this "spate of newspaper publicity" [343 U.S. 181, 72 S.Ct. 604] soon abated, and thereafter defendant made the headlines only infrequently. A similar falling off in the amount of publicity is disclosed by the newspaper exhibits before us.

The General Verdict of Guilty, the Question of Guilt or Innocence, and the Validity of the Statute Defining the Crime.

Appellants contend that the judgment of conviction was void because based upon a general verdict of guilty upon an indictment containing three counts two of which, it is asserted, are insufficient to support a verdict of murder in the first degree. It is argued that the general verdict which fails to specify upon which count or counts guilt is found is void unless each count of the indictment is a valid one in that it states facts showing murder in the first degree.

The first count charges that the appellants killed Theresa Wilder while committing and in the commission of the crime of rape; the second count charged the killing of said Theresa Wilder in an attempt to commit the crime of rape; the third count charges appellants with killing Theresa Wilder with extreme atrocity and cruelty.

▮ The statutes defining murder, §§ 11390, 11391 and 11392, Rev.Laws of Haw., 1945, are set out in the margin.[31]

---

30. Thus Majors, hiding at Kaneohe, on the opposite side of the Island from Honolulu, read the daily reports of the search for him. We note from the newspapers that airplane delivery of the papers was made on islands other than Oahu; price on Oahu 5 cents; airplane edition 7 cents.

31. "Sec. 11390. Murder, defined. Murder is the killing of any human being with malice aforethought, without authority, justification or extenuation by law, and is of two degrees, the first and second, which shall be found by the jury.
"Sec. 11391. Malice aforethought presumed. When the act of killing another is proved, malice aforethought shall be

The third of those sections defines murder in the first degree as "murder committed with deliberate premeditated malice aforethought, or in the commission of * * * any crime punishable with death, or committed with extreme atrocity or cruelty". In Republic of Hawaii v. Yamane, 12 Haw. 189, 201, it was said of this statute: "Our statute does not create distinct offenses of murder in the first degree, but one offense, one crime, which may be committed by any of the means described in the statute which, if proven, constitute the same felony. It is the same transaction." Under that rule the propriety of receiving a single general verdict would appear to be clear. The next question is whether, if one of the three counts contained in the indictment fails to state an act constituting murder in the first degree such a general verdict is insufficient to sustain a judgment of first degree murder. We assume that in that event the judgment could not be sustained.

■ The first contention made in this connection has to do with the count charging the killing of Mrs. Wilder in an attempt to commit rape. The crime of rape is punishable by death or imprisonment. § 11678 Rev.Laws of Haw., 1945. This would therefore be an "attempt to commit any crime punishable with death", within the meaning of § 11392, supra. The argument here made is that the admission by Majors in his third confession did not disclose an "intent to force"; that an essential element of attempted rape was missing from the proof, and that the proof in this respect went no further than to show assault with intent to rape under § 11665 which is punishable by fine and imprisonment. The weakness of this argument is that fundamentally it is an argument as to the insufficiency of the evidence of guilt. The question of guilt or innocence or the sufficiency of the evidence with respect thereto is not an issue in this proceeding.[32] §§ 10610 and 10611, defining attempts, and § 11665, describing assault with intent to rape or ravish are copied in the margin.[33]

presumed, and the burden shall rest upon the party who committed the killing to show that it did not exist, or a legal justification or extenuation therefor.

"Sec. 11392. Degrees defined. Murder committed with deliberate premeditated malice aforethought, or in the commission of or attempt to commit any crime punishable with death, or committed with extreme atrocity or cruelty, is murder in the first degree. Murder not appearing to be in the first degree is murder in the second degree."

32. Appellants are also proceeding upon the assumption that the only proof of guilt at the criminal trial was that contained in the confessions. This is a complete misapprehension. The connection of the two defendants with the crime was established through their possession of sundry articles stolen at or near the scene of the crime. These were the raincoats, the citronella and the canned foods, some of the cans being found with the raincoats when Palakiko was captured, and some in the bundle which Majors was carrying when he was captured. The defendants had entered the Wilder house in search of food. Those articles were introduced as exhibits in the crim-

inal trial and after identification by sundry witnesses. Also introduced were photographs taken so as to show the position of Mrs. Wilder's body when discovered. These furnished mute evidence of an attempted rape—the slacks worn by Mrs. Wilder had been removed; her under pants had been pulled down to a point slightly above the knees, her corset had been rolled up.

33. "Sec. 10610. Attempt. An attempt to commit an offense is some act done towards committing and in part execution of the intent to commit the same. As, for example, putting poison in the way of a person, with intent thereby to murder him.

"Sec. 10611. Preparation to commit. A mere preparation of the means of committing any offense, nothing being done in execution of the intent to commit the same, is not an attempt to commit the same. As, for example, merely procuring poison intended to be used for murder."

"Sec. 11665. Assault with intent to rape or ravish; penalty. Whoever maliciously assaults any female with an intent to commit the crime of rape or maliciously assaults any female child under

██ ██ Whether the acts proven at the criminal trial amounted to an attempt to commit rape or whether they amounted to some lesser crime, was a question of the interpretation of the Hawaiian statutes which could have been properly raised in that case or upon the appeal therein. That is a matter which would have to do with the question of the defendants' guilt or innocence of the charge. It is not for us in this proceeding to review the Territorial Supreme Court's affirmance of the conviction or to pass upon the guilt or innocence of the defendants. Nor would we undertake to overturn a holding of the Territorial Supreme Court that the acts here shown did amount to an attempt to commit rape rather than a mere assault with intent to rape. Cf. Waialua Agricultural Co. v. Christian, supra.[34]

Finally it is urged that the third count charging murder committed with extreme atrocity or cruelty fails to state an offense for the reason that this portion of the statute is so indefinite and uncertain and so lacking in definition that it fails to measure up to the requirements of due process. The court below in its opinion approved and adopted what had been said upon this subject by Mr. Justice LeBaron at the time the original petition for writ of habeas corpus was presented to him as an individual justice, when he referred it to the full court. His discussion of this subject is set forth in the margin.[35]

the age of twelve years * * * shall be punished by a fine not exceeding one thousand dollars and imprisonment at hard labor for life, or any number of years." ·

34. Likewise we cannot entertain the suggestion that whatever Majors may have done toward raping the woman, Palakiko could not have been guilty of rape or attempted rape. § 10670 Rev.Laws of Haw. 1945, provides that "All who take part in the commission of any offense, or, being present, aid, incite, countenance or encourage others in the commission thereof, shall be deemed principals therein." The question of the application of that section to Palakiko is not before us in this proceeding.

35. Application of Palakiko and Majors, 39 Haw. 148–150: "It is further significant that the provision in question has been a part of the statutory law of this Territory since 1890 (see L.1890, c. 72, § 2a) and presumably was adopted from the State of Massachusetts, which has had an identical provision on its statute books since 1858 (see Laws of Mass. 1858, c. 154, § 1–3; Gen.L.1932, c. 265, § 1) without the validity thereof being in issue before the appellate court of either jurisdiction. But judicial pronouncements and observations have been made in both jurisdictions which are interpretative of the words 'murder * * * committed with extreme atrocity or cruelty' consonant to judicial sanction of the validity of the provision containing them. (Rep. Haw. v. Yamane, 12 Haw. 189; Commonwealth v. Desmarteau, [16 Gray 1], 82 Mass. 1; Commonwealth v. Gilbert, 165 Mass. 45, 42 N.E. 336; Commonwealth v. Devlin, 126 Mass. 253; Commonwealth v. Feci, 235 Mass. 562 [127 N.E. 602]; Commonwealth v. McGarty, 323 Mass. 435, 82 N.E.2d 603.) In making them, the supreme courts of Hawaii and Massachusetts apparently had no difficulty in ascertaining the meaning of those words and their application to circumstances of murder in any particular case. Thus the supreme court of Massachusetts said that 'Those words mean that the means used were "extreme as compared to ordinary means of producing death." ' Commonwealth v. McGarty, supra, [323 Mass.] at page 440 [82 N.E.2d 603]; Commonwealth v. Devlin, supra, [126 Mass.] at page 255. To the same effect the supreme court of Hawaii approved an instruction which in part reads: 'It is not necessary in order to convict the defendants of * * * murder * * * with extreme atrocity or with extreme cruelty to prove that * * * the manner of committing it was the most atrocious or the most cruel possible; but the crime must have been committed with atrocity or with cruelty of a higher degree than is usually incident to murder.' (Rep. Haw. v. Yamane, supra, [12 Haw.] at page 209.) In similar vein, the supreme court of Massachusetts approved an instruction on murder committed with extreme atrocity and cruelty by observing that 'The crime of murder always implies atrocity and cruelty in the guilty party; but there are degrees of criminality in that respect, even in the felonious and malicious taking of human life; and, in order to justify a finding of murder in the first degree, it re-

When we consider the meaning of "extreme atrocity or cruelty", it is plain that there may be borderline cases with respect to which doubt might exist as to whether the facts fell within or without the term. Clearly enough the facts of the offense here committed are such that there cannot be doubt that this was a murder with extreme atrocity or cruelty. An elderly woman, with her jaw broken in five places, in consequence of repeated assaults, bound hand and foot and strapped to her bed, and left alone to starve in case she did not choke to death, had been plainly murdered under the circumstances described in the definitions quoted by Mr. Justice Le-Baron from the decisions of courts of Hawaii and Massachusetts (note 35, supra). This crime was "committed with atrocity or with cruelty of a higher degree than is usually incident to murder". Here was "something more than the ordinary incidents of crime. * * * Something manifesting a degree of atrocity or cruelty which must be considered as peculiar and extreme." It may well be questioned whether these appellants are in a position to complain about any uncertainty in the statute. As stated by Mr. Justice Holmes in United States v. Wurzbach, 280 U.S. 396, 399, 50 S.Ct. 167, 169, 74 L.Ed. 508: "The objection to uncertainty concerning the persons embraced need not trouble us now. There is no doubt that the words include representatives, and if there is any difficulty, which we are far from intimating, it will be time enough to consider it when raised by someone whom it concerns." [36]

quires that something more than the ordinary incidents of the crime shall exist—something implying more than ordinary criminality, and manifesting a degree of atrocity or cruelty which must be considered as peculiar and extreme.' (Commonwealth v. Devlin, supra, [126 Mass.] at page 255.) Such judicial pronouncements and observations are persuasive in harmony with the ordinary and commonly accepted meaning of the words contained in the provision and therefore explanatory of the fact that the issue of the provision's invalidity for vagueness or uncertainty has never been raised for appellate decision. Being of clear and unambiguous language, the provision in my opinion contains sufficient standards of guilt which readily can be determined by a jury objectively from the circumstances under which a murder has been committed such as those under which Palakiko and Majors committed murder and such as the comparable circumstances under which the defendants in the Devlin, Feci and McGarty cases, supra, committed murder. It thus meets the test of conveying sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. (See Connally v. General Constr. Co., 269 U.S. 385 [46 S.Ct. 126, 70 L.Ed. 322]; Jordan v. De George, 341 U.S. 223 [71 S.Ct. 703], 95 L.Ed. 886.) Nor are impossible standards of specificity required. I therefore declare the provision to be constitutional and the count of indictment based on it as well as the entire criminal proceedings against Palakiko and Majors to be valid."

**36.** Cf. Robinson v. United States, 324 U.S. 282, 286, 65 S.Ct. 666, 668, 89 L.Ed. 944, in which the court was considering the provision of the Federal Kidnapping Act, 18 U.S.C.A. §§ 10, 1201, 1202, which imposes the death sentence subject to a proviso that such sentence should not be imposed if prior to its imposition the kidnapped victim had been "liberated unharmed". To the suggestion that this proviso was invalid on the ground of the uncertainty of the phrase last quoted, the court said: "In most English words and phrases there lurk uncertainties. The language Congress used in this Act presents no exception to this general truth. One thing about this Act is not uncertain, and that is the clear purpose of Congress to authorize juries to recommend and judges to inflict the death penalty, under certain circumstances, for kidnappers who harmed their victims. **And we cannot doubt that a kidnaper who violently struck the head of his victim with an iron bar, as evidence showed that this petitioner did, comes within the group Congress had in mind.** This purpose to authorize a death penalty is clear even though Congress did not unmistakably mark some boundary between a pin prick and a permanently mutilated body." The above language which we have placed in blackface discloses that the court was not inclined to split hairs over the claim of uncertainty at the instance of one who

But assuming that these appellants are in a position to argue as to whether the statute meets the required standards of certainty, we note that in Commonwealth v. Devlin, 126 Mass. 253, referred to in note 35, supra, the Supreme Judicial Court of Massachusetts in 1879 gave further definition to the meaning of the challenged language. When the Republic of Hawaii in 1890 adopted the identical provision from the 1858 Massachusetts law it must be taken to have intended that there be carried with it the prior Massachusetts construction and definition stated in the Devlin case. Substantially the same definition was contained in the Yamane case decided by the Supreme Court of the Republic of Hawaii in 1899, Republic of Hawaii v. Yamane, supra. So defined, Fox v. State of Washington, 236 U.S. 273, 277, 35 S.Ct. 383, 59 L.Ed. 573, the phrase must be held to measure up to the required standards of certainty.

The common phrasing of the rule argued by the appellants is "where a statute is so vague as to make criminal an innocent act, a conviction under it cannot be sustained." Winters v. People of State of New York, 333 U.S. 507, 520, 68 S.Ct. 665, 672, 92 L.Ed. 840. Such is not the situation here. We here deal with the question of the *degree* of what must be considered to be a crime in any event.[37] When the Massachusetts and Hawaiian legislators fixed upon this concept of murder in the first degree it was obvious that the varieties of extreme atrocity or cruelty which might occur to killers would prevent more precise definition if the statute is to be made to apply to all cases within the contemplation of the legislature. Impossible standards of specificity are not required. United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877. We know of no better general discussion of this question than that to be found in Jordan v. De George, 341 U.S. 223, at pages 231 and 232, 71 S.Ct. 703, 95 L.Ed. 886, including the footnote thereon. We think that the Hawaiian court correctly held that this language is not void for uncertainty.

### Offers of Evidence Rejected.

Error is specified in respect to the rejection of certain evidence offered. This included offers to prove: that Officer Stevens, subsequent to the criminal trial, told a Miss Hughes that he "hit Palakiko a couple of times, and he talked"; that on one occasion one Heen complained to the Chief of Police and to Capt. Straus that Stevens had arrested Heen and threatened to beat him; that the police files showed a complaint to the department that Stevens had in the opinion of a Mrs. Mitchell, been spying on her; that they also showed a complaint of one Hashimoto that Stevens used abusive language when arresting Hashimoto for careless driving; that police records showed Stevens was once reprimanded for not reporting the beating of a prisoner by other officers; that they also showed a complaint that Stevens had beaten his ex-wife; a complaint by military officers about the beating of two soldiers "in which Stevens was involved."[38]

---

so clearly was outside of the excepting clause.

37. "Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." Boyce Motor Lines v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367. Cf. "The nature of a question of this kind is such that it must largely be left to the determination of the jury", Commonwealth v. Knowlton, 265 Mass. 382, 163 N.E. 251, 254, (a case under the Massachusetts statute here referred to),

with "* * * [T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." Nash v. United States, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232.

38. The court below had before it the testimony at the criminal trial where Stevens stated on cross-examination that he had been a member of the Hilo police force from 1936 to 1945, and that during that time he had several times been suspended for mistreatment of prisoners.

The asserted reason for these offers was for the purpose of impeaching (a) Stevens, who had denied striking Palakiko, and (b) the Chief of Police and Capt. Straus, who denied having received complaints about Stevens.

■ The impeachment of Stevens cannot be made in this manner for the reasons stated in Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L. Ed. 409. The other attempts at impeachment, since they were directed to collateral matters, were properly rejected. See 3 Wigmore on Evidence, (3d Ed.), §§ 1001–1003. Since they were not admissible for the purpose of impeachment, these matters are both hearsay and irrelevant.

The judgment is affirmed.