Henry THOMAS, Appellant,

v.

Harley O. TEETS, as Warden of the California State Prison at San Quentin, California, Appellee.

No. 14558.

United States Court of Appeals, Ninth Circuit.

March 7, 1955.

A. J. Zirpoli, San Francisco, Cal., for appellant.

Edmund G. Brown, Atty. Gen. of California, Clarence A. Linn, Charles E. McClung, Arlo E. Smith, Asst. Attys. Gen., for appellee.

Before HEALY, BONE and POPE, Circuit Judges.

POPE Circuit Judge.

The appellant Thomas who previously prevailed in his appeal to this court from an order denying his application for a writ of habeas corpus, Thomas v. Teets, 9 Cir., 205 F.2d 336, again appeals from a decision of the trial court denying the writ after a hearing on the merits, held pursuant to the directions of this court. Convicted upon his plea of guilty of murder in the first degree, in the Superior Court of Siskiyou County, California, Thomas is held by the respondent Warden pursuant to a judgment and sentence of death.

■ The grounds of appellant's application for a writ of habeas corpus are set forth at considerable length in our former opinion and no effort is here made again to recite them. In general he alleged a denial of his constitutional rights in two respects. He said that he was induced to plead guilty and to "keep his mouth shut" through the threats and misconduct of the county sheriff in whose custody he was while awaiting trial, in that the sheriff told him that he, a colored man charged with shooting a white woman, did not have a chance if he went before a jury; that if he pleaded guilty the judge would give him a light sentence; that if appellant did not cooperate the sheriff might let word get around and some people might not wait for a trial but might come and string him up, but that if he cooperated and did as the sheriff directed and pleaded guilty and did not cause anybody any trouble the sheriff would promise to get him a life sentence.

Appellant further stated that his court-appointed attorney told him that he was guilty; that if he stood trial before a jury he would "get gassed sure", but that if he pleaded guilty the attorney thought the judge would sentence him to life imprisonment; that the attorney knew the judge and would talk to him, and that the judge would surely give appellant a life sentence if a guilty plea were entered; that on the day set for the entry of appellant's plea this attorney went into the judge's chambers with the district attorney during a recess and without the appellant being present; that after his attorney came from the conference with the judge in chambers, the district attorney in the presence of appellant's attorney said that if appellant fought the case the prosecutor was going to "put me in the gas chamber", but that he would not ask the judge to "gas" him if he pleaded guilty; that the appellant's attorney nodded his approval to this suggestion and appellant proceeded to plead guilty; that by this time he was "too scared" to plead not guilty as he thought he

should; that he did not learn until after his automatic appeal to the Supreme Court of the State what had transpired in the judge's chambers; that during that session in chambers the judge warned the attorney that he would impose the death sentence even if appellant pleaded guilty, but that appellant's attorney never told him that and "never said a word about it"; that he then pleaded guilty only because he was "promised life and scared out of pleading not guilty".

The trial court after an extended hearing has found that none of these alleged occurrences happened—that the allegations of the appellant's application were not true. With respect to the statements concerning the sheriff, the court's finding that "the alleged coercive and wrongful conduct of the sheriff does not find support in the record", is abundantly supported by the evidence before the trial court. Not only did the sheriff deny saying or doing any of the things charged in the appellant's petition, but the circumstances suggest the falsity and lack of truth of appellant's assertions. Thus even after the Supreme Court of California had affirmed the judgment imposing the death penalty, Thomas wrote to the judge who had imposed the sentence asking his aid in seeking executive clemency from the Governor. (The letter was undated but it was answered by the judge under date of July 5, 1951.) Thomas then listed the reasons why he thought clemency should be extended to him including the fact that his associate in the robbery and killing who had pleaded not guilty had received only a life sentence. He stated that his court appointed attorney had told him he would not have a chance before a jury. He added, "The police who handled me said if I pleaded guilty and kept quiet you would give me life but that if I went on trial before a jury

I would get gassed." It is hard to believe that if appellant then thought there had been any suggestion that people "might string me up", he would have failed to say so in that letter.[1]

Thomas admits that about the same time that this letter was written a representative of the attorney general's office interviewed him at San Quentin concerning possible grounds for executive clemency and that in his conversation with this representative he said nothing about this implied threat by the sheriff. He admitted that he never told his lawyer about these matters.

█ The trial court also found that there was no truth in Thomas' claim that his attorney had failed to reveal to him before he entered his plea of guilty what had transpired in judge's chambers. The court below found: "It is manifest that his attorney conveyed to petitioner the substance of the conversations had with the trial judge." The testimony with respect to this issue was that following his appointment as appellant's attorney, the lawyer first studied the transcript of the preliminary hearing of Thomas and his companion in the killing, and on the day following he interviewed Thomas in an office in the jail building. He asked Thomas to tell him what had happened. The latter told how he and one McCain had planned to hold up a store near Tule Lake; that the two of them with pistols in their hands entered the grocery store, and that McCain got into a scuffle with a man there and McCain's gun was discharged; when Thomas heard that shot he became excited and pulled the trigger of his gun "but I did not intend to kill Mrs. Ainsworth". It is not disputed that it was the shot from Thomas' gun which hit and killed the wife of the grocery store owner. This, Thomas told the lawyer, was just what happened.[2]

1. The witness' testimony at the trial below was: "He said that he might let the word get around and some people might not wait for trial but come in and string me up."

2. All of this testimony was given by the lawyer after Thomas had testified as to the conversation at that time. The lawyer suggested the question of privilege and was directed to give this testimony in view of the concession of the parties that Thomas had waived any privilege.

The record of the preliminary hearing contained the transcript of a confession or statement which had been taken by the arresting officers from Thomas, and the lawyer next made inquiry with respect to that statement for the purpose of ascertaining whether it had been induced by any coercion, mistreatment, misrepresentations or promises. Thomas said that the officers treated him very nicely and disclosed no basis for questioning the admissibility of the statement. The lawyer advised Thomas that if the facts were as Thomas himself had stated he was guilty of murder, and that punishment for such an offense would be either life imprisonment or death. They discussed the possibility of avoiding a death penalty by pleading guilty. The lawyer suggested that he could speak to the judge in his office and see if he could thus avoid the imposition of the death sentence and secure life imprisonment. On the same day the lawyer went to see the judge, related to the judge the circumstances of the killing and that Thomas had told him that he did not intend to kill the woman; that there was a scuffle between McCain and another man; that McCain's gun went off and that when Thomas heard the shot he got excited and pulled the trigger but that he did not intend to kill any one. This was on December 4, 1950. Two days later, at the time which the court had fixed for taking the pleas of Thomas and McCain, the court inquired of counsel if they wanted to have a conference with the court which counsel for the State and for both defendants then requested. The judge and all counsel then retired to the judge's chambers, but without the defendants.[3]

The judge then opened the conference by referring to Thomas' lawyer having approached him previously and stating that the lawyer was ready "to enter a certain plea" for his client, hoping that his client might be saved the death penalty; and that the district attorney had stated that in the event of a guilty plea he would not insist upon the death penalty. The judge said that he had read the transcript of the testimony at the preliminary hearing and "I want to state that I will not make any bargain of any kind; and I will also state that I would be inclined to give the extreme penalty whether they plead guilty or not guilty. Now you can just use your own judgment in the matter * * *. Well I won't say definitely until I heard all of the evidence and everything of the kind in court but I just feel that way about it, and it is up to you folks to decide." Thereupon the lawyer talked to Thomas in the court reporter's room in the courthouse. The sheriff was present. He told Thomas that he had talked to the judge who said that he was inclined to give the death sentence but that he would not commit himself one way or the other. He said that he had known the judge since the time he went upon the bench in 1939; that to his experience the judge had never imposed the death penalty but that did not mean he would not do so in this case. He advised Thomas that in his opinion Thomas would be better off to stand trial before a jury because in that case "he had twelve chances to escape the death penalty whereas if he stood simply before the judge and pled guilty he had only one chance and the odds were twelve to one." He explained to Thomas the necessity for a unanimous verdict but he felt sure that he would be found guilty of murder; he explained that the requirement of a unanimous verdict was where the odds were in his favor on a jury trial, for if there happened to be one person on the jury who did not want to give the death penalty it was possible that he would escape it.

This of course is the testimony of the lawyer which it is apparent the trial court believed. This testimony disclosed that the lawyer fully advised Thomas of the seriousness of the situation; of the difficulty of decision as to whether

3. What then transpired was taken by the court reporter and is made a part of the record in the case.

to plead guilty or not guilty, and that Thomas himself made the decision, against the lawyer's advice, although the lawyer did not overrule it since Thomas appeared to be a very intelligent person and he felt the decision should be made by Thomas.[4]

The sheriff who at the time had Thomas in his custody and who was present during this conversation also testified that when he asked the lawyer in Thomas' presence whether a plea of guilty would get any consideration from the court, the lawyer replied, "I don't think so. I just talked with the judge."

■ We conclude therefore that the trial court was justified in finding as it did that the allegations of appellant's petition were not sustained by the evidence and that in fact the matters there set forth both in respect to the claimed misconduct of the sheriff and the asserted concealment by the attorney had not taken place. As we said in a similar case: "It is of the essence of appellate review that the court to which the appeal is taken give due respect to the primary function of the trial court in finding and determining the facts." Palakiko v. Harper, 9 Cir., 209 F.2d 75,

89, certiorari denied 347 U.S. 956, 74 S.Ct. 683, 98 L.Ed. 1101.

Upon this appeal we are now presented with a new contention on the part of the appellant. This is that the record of what transpired at the time the sentence was imposed upon Thomas discloses that (a) Thomas was denied effective representation of counsel; and (b), that he was denied due process by the judge. This claim relates to the alleged failure of counsel then to place before the judge, and the refusal by the judge on his part to accept, proof of circumstances to mitigate the offense or to lessen the punishment.

Some aspects of this portion of the proceedings in the Superior Court was discussed by the California Supreme Court in its opinion upon Thomas' mandatory appeal, People v. Thomas, 37 Cal. 2d 74, 230 P.2d 351, 352. Upon that appeal where Thomas was represented by two court appointed attorneys including the same one who had represented him below, one of the assignments of error was that "the court erred in failing to take evidence to ascertain the penalty to be imposed." In that court's opinion, the substance of what transpired at the time judgment was pronounced is stat-

---

4. "I also told him that he must realize his position in this case and, that is, that he was a colored man. He was charged with shooting and killing a white woman in the perpetration of a robbery and that this was one of the cow counties of Siskiyou County and that it's hard to tell whether a jury would be prejudiced against him because he happened to be a colored man. And that is why I wanted his opinion as to what he would like to do; although I again repeated that it was my advice to him to plead not guilty and stand trial before a jury, that that did not mean that he would be acquitted of the charge, but simply he would have a chance of escaping the death penalty.

"I might say yes, that Mr. Thomas, in all the times that I talked to him, gave me the impression of being a very intelligent person and I had a respect for him as being a person who was able to form an opinion and judgment for himself. And that is why I asked him to think about it, and he did. He sat there with his head down and I could see that he was reflecting and thinking very deeply on it.

"And while he was thinking, Mr. Richardson, the sheriff, spoke up and told him as follows, he said: 'You have one of the best lawyers in Siskiyou County to represent you, and my advice to you is that if I were you I would do what your attorney tells you to do.' * * *

"However, when he stated that he wanted to plead before the judge, I again told him that that was not my advice, but that I did not feel that I should overrule his decision because of the thing that was involved, and that was it was his life. I told him that it was his life that was in the balance and that I wanted him to make the decision, which way it would go.

"Mr. Thomas replied to me, he said, 'Yes, I know.' He says, 'And I don't want to die.' He said, 'I am too young to die.' Then he said, 'Well, I am ready to go in and plead before the judge.'

"I said, 'All right, if that is what you want to do, let's go in and do it.' "

ed.[5] The record shows that after the case was called and the presence of defendant and his attorney noted, the court stated that, pursuant to § 190 of the Penal Code, before pronouncing sentence the court must determine the degree of the offense, and that the court would hear evidence on that point. The district attorney called and examined the husband of the slain woman who had been present at the killing and he related the circumstances under which Thomas and McCain, who was also a negro, had entered the store and ordered the opening of the cash register saying: "This is a stick-up" ; McCain pointed his gun at the store owner, the witness seized the gun barrel and pushed it down as McCain fired. Thomas then shot and the witness' wife was hit, she fell into her husband's arms and died. The attorney for Thomas did not cross-examine and the following occurred: "The Court: Step down. I don't think we will need any further. (Mr. Burton [the district attorney]: I don't think we will need any thing further, your Honor. The Court. All right. The law provides that all murder which is perpetrated in an attempt to commit robbery is murder of the first degree. Therefore, the Court will find and determine that this murder to which the defendant has pleaded guilty is murder of the first degree. This is the time for pronouncing judgment, the Court will ask the defendant to stand up, please. (The defendant arises)." The court then proceeded to impose the death sentence.

■ The contention now being made is that Thomas was denied the effective assistance of counsel. In making this assertion he says that under the circumstances there was no competent or intelligent waiver of trial by jury; that he was not fully advised of his rights and the possible consequences of a plea of guilty, and that his plea was not entered voluntarily. However, the primary basis for this contention of denial of the effective assistance of counsel is that first, the attorney failed to cross-examine the dead woman's husband when the latter was relating the circumstances of the crime, and second, and more important, that he did not present to the court any circumstances of mitigation such as the claim of Thomas that he did not intend to hit the woman; that Thomas had served in the Army during the war; and that he may have had a drink of whiskey before the holdup.

We think that in the light of the decisions of this and other courts, the record here is wholly without evidence to support any finding that there was any denial of the effective assistance of counsel. The court appointed attorney had had eleven years experience in the active practice of the law all of it in this county. For eight years during that time he had been an assistant district attorney; subsequently he had had substantial practice in the defense of criminal cases during his private practice. We have been impressed with the fact that although appellant had no more than an eighth grade education he was a man of real intelligence. The record shows that in his conversations with his lawyer he fully appreciated the seriousness of his situation and all the factors which he must take into consideration in reaching the decision which he finally made. As the trial court said: "The decision surrounding the entry of the plea involved a calculated risk." In our view the calculation was made intelligently, knowingly and with the aid of sound, legal advice. What Thomas is attempting to urge here is that the lawyer was at fault for not forcing Thomas to follow the advice to go to trial before a jury.

As for the failure of the lawyer to cross-examine the husband of the deceased woman, the lawyer explained and the record shows that the circumstances

5. The statement on page 352 of 230 P.2d that "Thereafter when asked by the court whether he had any legal cause to show why sentence should not be pronounced, defendant stood mute", is inaccurate in that the record does not show that this inquiry was made by the judge.

of the killing related by the witness were exactly the same as those told to the lawyer by Thomas. Any attempt to cross-examine this witness, who had broken down and was in tears, and thus keep him longer on the stand plainly would have been folly.

The judge below questioned the attorney with great care for the purpose of bringing out why it was that immediately before the sentence was imposed the lawyer did not get up and make a statement or attempt to introduce some evidence in an effort to procure a mitigation of the sentence. Previously the attorney had testified that the State court judge had said after he had heard the dead woman's husband, "that is all", and indicated that he did not want to hear anything more.[6] Upon the interrogation by the court below the attorney testified: "Q. And when the judge indicated that he had had enough, you accepted that as a word of finality? A. I did, Your Honor, because from my experience in practicing before Judge Allen for about eleven years, if he wishes anything more, he addresses counsel and asks, 'Do you have anything to offer? Do you want to say anything?' In this case he didn't do that. He says, 'I think that is enough', or words to that effect." He said that because of his experience with this particular judge he knew that when he said something he meant it. As we said in Palakiko v. Harper, supra, dealing with a similar problem, "The rule is as stated in United States v. Pisciotta, 2 Cir., 199 F.2d 603, 607: 'Nor will allegations of incompetence

or inefficiency on the part of his counsel ordinarily suffice, unless counsel's purported representation "was such as to make the trial a farce and a mockery of justice." ' "

As a matter of fact, the judge who sentenced Thomas had been informed of most of these circumstances of mitigation. The record shows that when the lawyer first went to see the judge he explained that it was Thomas' statement that he did not intend to kill the woman; that there had been a scuffle between another man and McCain; that Thomas became excited and pulled the trigger without any intention to shoot any one. The judge had read the record of the preliminary hearing before the magistrate at which not only Thomas and McCain but also a third colored man named Joe Cooper were bound over to the Superior Court. That record disclosed the movement of these defendants on the day prior to the shooting,—that they had been driving around together; that Thomas had gotten his pistol from Cooper; that there had been some drinking, and that Cooper was intoxicated. The same record contained Thomas' statement to the officers that he did not intend to shoot any one when he went into the store, and that the shooting of the woman was unintended. Apparently of the circumstances which appellant lists as those of which the judge should have been informed, the only one not called to the attention of the court was appellant's army service and his honorable discharge.[7]

6. "Q. Would I be correct in saying that you made no statement whatsoever on behalf of Mr. Thomas? A. That is correct, because the record shows the court said: 'That is all.' The court indicated that it did not want to hear anything more. Q. Well, am I to understand then, that the court precluded you from making any statement or offering any evidence in mitigation and in favor of Mr. Thomas? A. I believe that you can understand me that way. It's hard to explain just exactly the situation. You can't put it in writing. That was one of the points upon which we relied on the automatic appeal, and that is that there was something in the demeanor and the conduct of the judge, the tone of his voice, the expression of his face when he said, 'That is enough', after he heard Mr. Ainsworth testify, sobbing and crying as he testified as his wife was shot down, that the judge did not want to hear anything more."

7. Of course, whether the court would consider his being an army veteran furnished Thomas some excuse is a question. Perhaps his training in the use of firearms would make his story of shooting out of pure excitement less credible.

Finally appellant argues that the trial court denied the appellant due process of law by precluding and preventing the presentation of matters in mitigation of punishment prior to the imposition of sentence. Says appellant: "We repeat, that the transcript of the record clearly shows that not only was the accused (and his counsel) not asked to make a statement, but they were, in fact, precluded from doing so by the trial judge." And also: "The denial of due process of law in the instant case is more the direct result of the conduct of the trial court itself than that of counsel appointed to represent him, for the court, in effect gave him no hearing at all."

The California Penal Code, § 190, provides: "Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the jury trying the same; or, upon the plea of guilty, the court shall determine the same; * * *." The Supreme Court of California [37 Cal.2d 74, 230 P.2d 352] pointed out upon its hearing of Thomas' appeal, and its consideration of the claim that there was error in failing to take evidence to ascertain the penalty to be imposed, that the judge before whom the plea was entered could in the exercise of his discretion, consider matters in aggravation as well as in mitigation of the offense and that in doing so the court may consider many matters "not admissible on the issue of guilt or innocence." Cf. Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L. Ed. 1337. But suppose that the judge, at some stage of the proceeding, comes to the conclusion that he has heard enough, and that his knowledge of the facts and of the accused is sufficient to satisfy him as to what penalty he should impose? Suppose that the judge has concluded from the undisputed facts of the killing that the death penalty should be imposed and says: "I will hear no more." Is that a denial of due process? We think not.

In Williams v. New York, supra [337 U.S. 241, 69 S.Ct. 1081], after a jury in the state court had found appellant guilty of murder in the first degree and recommended life imprisonment, the trial judge imposed a sentence of death. The Supreme Court rejected the claim made that due process had been denied the accused because the judge before imposing sentence had considered the report of the court's probation department which, under the New York statute, was permitted to be made up of reports of the accused's criminal record, of his mental and physical examinations, and "any information that will aid the court". In its discussion of that case the Supreme Court used the following language which we think most adequately expresses the rule that should be applied here, 337 U.S. at page 251, 69 S. Ct. at page 1085: "And it is conceded that no federal constitutional objection would have been possible if the judge here had sentenced appellant to death because appellant's trial manner impressed the judge that appellant was a bad risk for society, or if the judge had sentenced him to death giving no reason at all."

As was stated by the court in People v. Thomas, supra [37 Cal.2d 74, 230 P. 2d 353], the law of California provides that " 'the trial court is vested with discretion to determine the punishment * * * [the Supreme] court has no power to substitute its judgment for that of the trial court.' " Such discretion necessarily includes the exercise of discretion as to what, if any, "matters in mitigation" the trial judge will take into consideration. If, in view of the judge, the circumstances of this crime, in and of themselves, and wholly apart from any other considerations, called for the death penalty, then to impose it was his simple duty. In no respect can his refusal to hear further evidence be deemed a denial of due process.

The judgment is affirmed.